NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued November 13, 2012
Decided January 31, 2013

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| No. 11-3482 | |
| | Appeal from the |
| MARLENA JONES, | United States District Court for the |
|     *Plaintiff-Appellant,* | Northern District of Illinois, |
| | Eastern Division. |
|     *v.* | |
| | No. 08 C 5256 |
| ILLINOIS STATE TOLL HIGHWAY | |
| AUTHORITY, | William T. Hart, |
|     *Defendant-Appellee.* | *Judge.* |

**O R D E R**

Marlena Jones appeals the dismissal at summary judgment of her lawsuit claiming that the Illinois State Toll Highway Authority fired her because she is African American, in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e-2(a)(1). Because Jones failed to establish a prima facie case of discrimination, we affirm the judgment.

## I. Background

The Tollway Authority hired Jones as a toll collector in 1992. Her duties included collecting tolls and depositing income from tolls at the end of each shift. Jones also was trained in 1999 or 2000 to be a Collector in Charge ("CIC" for short), whose job is to ensure that toll booths are staffed, that tolls collected are secured in the toll plaza's safe, and that the money in the safe at the end of a shift matches an accounting of tolls collected and is recorded on a standard form called a TC-12.

On May 27, 2007, Jones was on duty at Plaza 39. She collected tolls from 2:00 p.m. until 6:30 p.m. when she began a CIC shift that lasted until 10:00 p.m. Toward the end of her CIC shift, Jones attempted to balance the safe and prepare a TC-12 report. She did not count the money accurately, prompting her to believe there was an excess of $40 in the safe. (Jones had counted 610 rolls of dimes when there were only 602.) If a CIC determines that there is an overage, she must complete a special report on a TC-42 form and place the extra funds in a separate bag in the safe. Jones did not complete a TC-42 report or put what she thought were the extra funds in the safe. Instead she took four of the six $10 bills in the safe and placed them in her shirt pocket, and wrote on the TC-12 report that the total count included only two $10 bills.

Michelle Bolek, the incoming CIC tasked with verifying Jones's TC-12 report, arrived at Plaza 39 at approximately 9:30 p.m and counted the money in the safe. Chester Miller, another Tollway Authority employee, was present in the office with Bolek and Jones. Jones states that she mentioned the overage to Bolek as soon as she came on duty, but in her deposition Bolek testified that Jones did not mention the overage until Bolek had discovered a discrepancy. Bolek noticed that Jones had listed 610 rolls of dimes on the TC-12 report, but Bolek counted only 602 rolls of dimes in the safe. Bolek commented on the $40 shortage to Jones, and only then, she maintains, did Jones remove the four $10 bills from her shirt pocket. Jones and Bolek created a new TC-12 form to reflect the correct totals.

After Jones had left, Bolek prepared a written report of the incident for Judy Parks, the plaza manager. Bolek states in that report: "I was not notified before starting to balance that there was a problem with the safe. I had to find out on my own." On June 1, 2007, Tracey E. Smith, who at that time was the chief of administration for the Tollway Authority, suspended Jones pending investigation. Smith assigned the investigation to Joseph Fivelson, the senior manager of investigations at that time. Fivelson interviewed both Jones and Bolek. Jones admitted that she had placed the $40 into her pocket while acting as CIC; she also told Fivelson that she had informed Bolek she was having difficulty balancing the safe before Bolek started her count. In her interview, however, Bolek maintained that Jones did not mention any difficulty balancing the safe until Bolek had

discovered a discrepancy. Fivelson did not interview Miller. The investigation report concluded that Jones "took money belonging to the Tollway and falsely reported in her TC-12 amounts that concealed this fact thereby attempting to permanently deprive the Tollway of these funds." Smith sent Jones a letter of termination on July 30, 2007.

Jones filed a charge with the EEOC alleging racial discrimination. The EEOC issued a right-to-sue letter, and Jones then sued under Title VII in September 2008. (She included a claim under 42 U.S.C. § 1983 against two Tollway Authority officials but later dismissed them from the suit voluntarily.) The Tollway Authority moved for summary judgment. In opposing that motion, Jones relied on the indirect method of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). She asserted that she had followed the defendant's procedures for balancing the safe and thus had performed her job satisfactorily. Jones also identified Patricia Pullia as a similarly situated employee outside her protected class who had been treated more favorably. Jones criticized Fivelson's investigation as "hardly sound or credible" and asserted that eight months before she was fired, several employees had been planning to initiate grievances against Parks for being racist.

The district court entered summary judgment for the Tollway Authority, concluding that Jones had failed to produce evidence establishing that a similarly situated employee not in her protected class was treated more favorably. The court also held that Jones's evidence that Parks harbored racial animus—a coworker's e-mail alerting her supervisor and Parks about some workplace gossip that four employees were contemplating filing a grievance accusing Parks of being racist—was hearsay and could not establish that Parks discriminated against Jones or anyone else.

Twenty-four days after entry of that judgment, Jones replaced her first attorney with the lawyer who represents her in this appeal. That same day new counsel moved for reconsideration, ostensibly under Federal Rule of Civil Procedure 60(b). In her motion counsel failed to identify any applicable basis for relief in Rule 60(b) and, in fact, conceded that the "court's ruling might be supportable based on the presentation of the cause of action." Jones insisted again that Pullia had been treated more favorably, and she also noted that a different white employee was *fired* after being caught with cash in his pocket. Counsel attached to her motion a new exhibit that was not submitted at summary judgment by either party: the "final" TC-12 report from May 27, 2007, with all funds appropriately accounted for. Counsel argued that Jones was fired for writing an inaccurate "draft" TC-12 form and that the final form was mysteriously ignored by the Tollway Authority during its investigation. The district court denied this motion, again emphasizing that Jones had failed to identify a similarly situated employee of a different race who was treated more favorably. The court explained that Jones was erroneously focused on her claim of innocence. The relevant inquiry, the court continued, is whether the

Tollway Authority reasonably inferred that Jones intended to keep the money. On this point, the court concluded, Jones had not created a triable issue of fact.


## II. Discussion


On appeal Jones argues that she presented sufficient evidence to survive summary judgment. Before reaching the parties' arguments, however, we note several problems with Jones's brief. First, counsel has included in the appendix seven documents[1] that are not a part of the record before the district court. We agree with the Tollway Authority that the inclusion of these documents is improper, so we do not rely on them in considering this appeal. *See United States v. Raymond*, 228 F.3d 804, 809–10 n.5 (7th Cir. 2000); *Berwick Grain Co. v. Ill. Dep't of Agric.*, 116 F.3d 231, 234 (7th Cir. 1997) ("The appellate stage of the litigation process is not the place to introduce new evidentiary materials."). In her reply brief, Jones insists that the Tollway Authority actually submitted the majority of these documents to the district court, but an examination of the record shows this representation to be untrue.

In addition, in her opening brief, counsel cites to deposition excerpts that were never submitted as exhibits at summary judgment.[2] Confronted again by the Tollway Authority, counsel insists in her reply brief that the challenged excerpts are all part of the record on appeal even if her record citations are inaccurate. This contention also appears to be false. For example, in her opening brief, counsel states that "Parks claimed that Bolek told her that Jones would not have produced the money had Bolek not caught the discrepancy." Counsel cites to "Doc #5, Parks Dep. at p. 50" to support this statement. Page 50 of Parks's deposition is not included in the record on appeal, and this statement by

---

[1] Those documents are (1) a memorandum from Parks to Jones signed on May 29, 2007, stating that Jones was removed from CIC duties pending investigation; (2) the response Jones wrote to the Tollway Authority after learning she was being fired; (3) a report by another employee about a separate incident involving Jones; (4) an e-mail from Parks to another employee expressing concern about Jones's actions on May 27, 2007; (5) a May 30, 2007 report written by Jones addressing the incident with the $40; (6) a June 1, 2007 notice from another supervisor to Smith requesting disciplinary suspension for Jones; and (7) an excerpt from the Tollway Authority's personnel policy and procedures manual.

[2] For example, Jones cites to Parks's deposition at pages 38, 48–50, and 72, and to Bolek's deposition at pages 21, 22, and 70. None of these pages are included in the record on appeal.

Parks appears nowhere in the record. In addition, counsel cites to "Doc #5" throughout the opening brief, but we cannot tell what "Doc #5" is, and neither can the Tollway Authority. Jones says her citations are to the "appellate docket numbers," but docket entry 5 is her transcript information sheet. Assuming that counsel meant the district court's docket numbers, docket entry 5 is a summons. We ignore any reference to testimony not in the record. *See Stevens v. Hous. Auth. of S. Bend, Ind.*, 663 F.3d 300, 310–11 (7th Cir. 2011); *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 324 n.7 (7th Cir. 1995); *Henn v. Nat'l Geographic Soc.*, 819 F.2d 824, 831 (7th Cir. 1987) ("Parties who designate and file parts of a deposition for a district judge's consideration must be aware that the remainder of the deposition is not in the record on appeal.").

## A. Legitimate Employment Expectations and Pretext

Turning to the merits, Jones argues that she established a prima facie case of discrimination under the indirect method of proof. She asserts that she worked for the Tollway Authority for 15 years without incurring any disciplinary action, and thus her job performance met her employer's legitimate expectations. The Tollway Authority responds that Jones did not meet expectations for the same reason that she was fired: She falsely reported the number of $10 bills on the initial TC-12 form and placed four $10 bills in her shirt pocket in an attempt to steal them. Because the Tollway Authority's proffered reason for firing Jones is also the basis for its conclusion that she was not meeting expectations, the question whether her performance was satisfactory merges with the inquiry into whether the stated reason was pretextual. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010); *Senske v. Sybase, Inc.*, 588 F.3d 501, 506–07 (7th Cir. 2009); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). To demonstrate pretext, Jones was required to show that the nondiscriminatory reason given for firing her is a lie masking discriminatory intent. *See Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009); *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007).

In making the argument that the Tollway Authority's proffered reason was pretextual, Jones makes a number of points, none of them meritorious. We discuss the five most significant arguments and then move on to her argument that similarly situated employees were treated more favorably.

First, Jones argues that she established pretext by showing that the Tollway Authority's investigation of the incident was inadequate. She asserts that Fivelson based his investigation almost exclusively on his conversation with Bolek, failed to interview

Miller (the third person in the room with Bolek and Jones), failed to look into allegations that Parks is racist, failed to consider Jones's unwavering claim of innocence, and ignored the "final" TC-12 report, with all funds appropriately accounted for. Fivelson testified, however, that his investigation included a review of the first TC-12 report and Bolek's written report, as well as interviews with Bolek and Jones. He explained that he did not seek out and interview Miller because he deemed that step unnecessary after interviewing Jones. At the beginning of the interview, Jones said she had held the $40 in her hand; only as the interview progressed did she admit putting the money in her pocket. Fivelson thought this change in her story established that Jones had lied. Moreover, Fivelson was tasked only with investigating Jones's conduct on May 27, 2007; he was not asked to investigate allegations that Parks is racist. And Jones's emphasis on the "final" TC-12 report is irrelevant; that an accurate TC-12 report was prepared *after* Jones was found in possession of four concealed $10 bills does not undermine Fivelson's conclusion that she had lied on the original TC-12 report in an effort to conceal a theft. Finally, even if Fivelson's investigation could have been more thorough, Jones has failed to show that anything about it was not in compliance with normal procedure. *See Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407 (7th Cir. 2007), *affirmed on other grounds by CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) ("This is not to say that merely pointing to an employer's shoddy investigatory efforts is sufficient to establish pretext. Erroneous (but believed) reasons for terminating an employee are not tantamount to pretextual reasons.").

Second, Jones contends that the Tollway Authority disregarded what she views as a policy favoring retention of employees who make mistakes in their cash counts. She asserts that Parks and another supervisor admitted in their depositions that "there was no policy for termination of a CIC after an interim count, since it was common to have errors in balancing the safe." Once again, Jones simply refuses to accept that she was fired, not because she made an honest mistake in completing her TC-12 form, but because her employer concluded that the "mistake" was intended to conceal that she had pocketed four of the six $10 bills in her care. Jones is alone in the view that her TC-12 was meant to be a "preliminary" or an "interim" count. The Tollway Authority concluded that Jones's TC-12 was her final word about her cash count and that the report became "interim" in her mind only because it was discovered to be false. And there was no policy against firing employees caught trying to steal the tolls they collected; just weeks earlier Glenn Wittke, the white CIC identified by Jones in her postjudgment motion as someone treated more favorably, was fired for attempted theft under similar circumstances.

Third, Jones insists that by firing her the Tollway Authority disregarded its policy of "progressive discipline." As proof Jones cites to a document that was not before the district court—an excerpt from the Tollway Authority's "Personnel Policies & Procedures

Manual." Even if we were to consider the manual, Jones offered no evidence that the policy of progressive discipline was disregarded; in fact, the manual states that the Tollway Authority's policy is to favor progressive discipline "where appropriate," not in all circumstances. More to the point here, the manual provides that when discipline is administered, "particularly serious or aggravated infractions may warrant departures from progressive disciplinary steps and, in some cases, immediate discharge." Jones does not argue that theft isn't a "particularly serious or aggravated infraction," nor does she even mention the levels of progressive discipline set forth in the manual. The steps in the process are telling. First, oral reprimands are encouraged for "relatively minor infractions or performance problems." Written reprimands are used when an oral reprimand does not seem sufficient or has already been used to no avail. Suspension without pay is appropriate if a reprimand has not worked or the gravity of the offense calls for "a more stringent initial corrective action." And "[d]ischarge is initiated when other corrective measures have failed *or if the gravity of the offense warrants such action*." (Emphasis added.) Nothing in the policy manual requires the Tollway Authority to address a matter as serious as employee theft with small measures. Indeed, the policy permits immediate discharge for serious misconduct, and that is exactly what the Tollway Authority did in Wittke's case. Thus, not only did Jones fail to introduce the policy manual at summary judgment, but her present contention that the Tollway Authority "ignored" the progressive-discipline system is not supported even by the exhibit she improperly included in her appendix. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (finding no evidence of pretext where employer's progressive-discipline policy permitted discharge for serious offenses); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 828 (7th Cir. 2006) (concluding that the employer did not violate policy of progressive discipline where handbook reserved for employer the right to fire employees at its discretion).

Fourth, Jones contends that at summary judgment she introduced evidence that Parks, Bolek, and another toll collector had improper motives. She points to the September 2006 e-mail from a tollway employee alerting her supervisor that a coworker had said that "someone" told him that four employees (including Jones) were planning to file a grievance against Parks (who was copied on the e-mail) because they "feel that [she] is racist." Jones contends that this e-mail shows that Parks initiated the investigation out of racial animus. To the contrary, the e-mail is empty of specific facts implying that Parks discriminated against Jones or anyone else. It is frivolous to contend that a jury reasonably could find (the hearsay rule notwithstanding) that Parks must have been motivated by racial animus because an employee overheard someone else saying that someone else thought that other employees were going to accuse Parks of being racist. Moreover, Parks was not the decision-maker. The record shows that it was Smith who suspended Jones, assigned Fivelson to investigate her, and ultimately fired her.

Equally frivolous is Jones's invocation of the "cat's paw" theory of liability. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011); *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). Without any citation to the record, Jones accuses Bolek and another toll collector of manipulating Parks and other Tollway Authority supervisors to fire her. According to Jones, the toll collector "twisted facts" about Jones's role in service disruptions on the day of the incident, and Bolek started a "rumor" that Jones had attempted to steal $40. Even if Parks was the decision-maker, one wonders why she needed to be manipulated if she is herself racist, and of course the theory cannot work unless Bolek and the toll collector themselves harbored racial motives, which Jones does not allege. Jones offered no evidence to contradict Bolek's deposition testimony that she reported the incident to Parks because "if there is an incident on your shift, you're supposed to write it up." And the toll collector's report is irrelevant; Jones was not fired for contributing to service disruptions.

Fifth, Jones points to what she characterizes as inconsistent statements from Bolek, Parks, and Fivelson as evidence of pretext. Bolek said in her deposition that she never told anyone she thought Jones intended to steal the $40. Jones claims that this testimony contradicts Parks's testimony that Bolek had told her that Jones would not have produced the money if Bolek hadn't discovered the discrepancy first. As support, Jones cites to a page of Parks's deposition not included in the record on appeal, so we will not consider the assertion. Jones also argues that Bolek denied telling Fivelson that she believed Jones intended to steal the $40 and that this contradicted Fivelson's testimony. On this point Jones again mischaracterizes the evidence. Bolek and Fivelson both testified that Fivelson *did not* ask Bolek whether she believed that Jones intended to steal the money, so there is no evidence that Bolek ever speculated to Fivelson about Jones's intentions. Finally, Jones does not explain how either of these claimed inconsistencies bears on whether the Tollway Authority's proffered reason for firing her was a lie. Thus, this last argument is no stronger than the other four, and none of the five suggest a material dispute of fact about whether Jones was meeting the Tollway Authority's expectations or whether the reason she was fired was pretextual.

## B. Similarly Situated Employees

Jones also disagrees with the district court's conclusion that she failed to provide evidence of any employee outside her protected class who was "similarly situated with respect to performance, qualifications and conduct" yet treated more favorably. *See Snipes v. Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002). Jones points to Pullia—a white toll collector—as an example of an employee who received more lenient discipline. But to be comparable, an employee who received more lenient treatment than the plaintiff "must at

least share 'a comparable set of failings.'" *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012) (quoting *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003)). Pullia and Jones were disciplined for different conduct. Jones was fired for attempted theft after she concealed four $10 bills in her pocket, falsely reported on her TC-12 report that there were only two, and, according to Bolek's report and the subsequent investigation, said nothing about the $40 until Bolek noticed a discrepancy in the count. Pullia, on the other hand, was disciplined for possessing "unsecured funds" after she discovered $40 in the pocket of her work vest, realized she had failed to deposit the money at the end of her shift, and returned the money as soon as she discovered her mistake, before anyone knew it was missing. These are materially different circumstances. It is not the role of the courts to decide which employment infractions deserve greater punishment; "[i]t is enough that the misconduct that led to the adverse job action in question is sufficiently distinct to render the proposed comparators not similarly situated." *Id.*; *see Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006).

The Tollway Authority responds further that Wittke, the white employee belatedly identified in Jones's motion for reconsideration, was discharged for the same misconduct as Jones. The relevant investigation report states that Wittke was asked by his relieving CIC about a $300 discrepancy between the money in the safe and the TC-12 form. When the CIC went to the phone to call the police, Wittke pulled $300 from his pocket and explained that he had placed the money in his pocket accidentally while looking for his keys. Wittke was suspended pending an investigation, investigated, and ultimately discharged on April 5, 2007. Jones counters that the incident involving Wittke is distinguishable because "money had actually been taken" and "no accurate report had been filed." That is not true. No money left the toll plaza in either case, and after Wittke returned the $300, "the Plaza Fund balanced."

## C. Direct Method of Proof

Finally, Jones attempts to invoke the direct method of proof. The Tollway Authority argues that Jones waived any argument under the direct method by failing to raise it in opposition to the motion for summary judgment. Although Jones mentioned briefly the direct method in her postjudgment motion, we agree that it was too late to be considered by that time. *See Caisse Nationale de Crédit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996); *Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986) ("[A] motion for reconsideration is an improper vehicle . . . to tender new legal theories."). In any event, Jones's evidence—that no money was ultimately stolen, that the final TC-12 report was accurate, and that the investigation was inadequate—does not point directly to a

discriminatory reason for the Tollway Authority's action. *See Abuelyaman v. Ill. St. Univ.*, 667 F.3d 800, 809 (7th Cir. 2011).

AFFIRMED.